Andrew M. Calamari
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place, 200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0080 (Brody)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| *Plaintiff*, | : | |
| v. | : | |
| PREMIER LINKS, INC., DWAYNE MALLOY, CHRIS DAMON, THEIRRY RUFFIN a/k/a THEIRRY REGAN, | : | ECF CASE |
| *Defendants*, | : | COMPLAINT |
| -   AND   - | : | |
| JOHN DESANTIS, ROBERT BLOOME, JOSEPH J. BYRNE, NICHOLAS SPINELLI, MARGARET RAVA a/k/a MARGARET AMATULLI, DARNEL JACKSON, FREDDIE ANDERSON, QUATRO HOLDINGS, INC., and NYC CLAIMS, INC., | : | JURY TRIAL DEMANDED |
| *Relief Defendants.* | : | |

---

Plaintiff Securities and Exchange Commission (the "Commission") for its complaint

against Defendants Premier Links, Inc. ("Premier Links"), Dwayne Malloy ("Malloy"), Chris

Damon ("Damon"), and Theirry Ruffin a/k/a Theirry Regan ("Ruffin") (collectively

"Defendants") and Relief Defendants John DeSantis ("DeSantis"), Robert Bloome ("Bloome"),

Joseph J. Byrne ("Byrne"), Nicholas Spinelli ("Spinelli"), Margaret Rava, a/k/a Margaret

Amatulli ("Amatulli"), Darnel Jackson ("Jackson"), Freddie Anderson ("Anderson"), Quatro

Holdings, Inc., ("Quatro Holdings") and NYC Claims, Inc. ("NYC Claims") (collectively, the

"Relief Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      Premier Links operated an unregistered broker-dealer in Staten Island, New York

that functioned as a boiler room targeting elderly investors across the United States from at least

December 2005 to approximately August 2012 (the "Relevant Period").

2.      During the Relevant Period, sales representatives paid by Premier Links cold-

called prospective investors and pressured them to invest in the unregistered securities of

speculative start-up companies, often stating that the companies would soon conduct initial

public offerings ("IPOs").  These sales representatives, including Malloy, Damon, and Ruffin

(the "Individual Defendants"), used high-pressure sales tactics to induce investors to purchase

stock in these start-up companies.

3.      Defendants never disclosed that only a small fraction of the funds received from

investors would be transmitted to the promoted companies.  Instead of using the money as

represented, Defendants misappropriated over 90% of the investors' money.  Most of the money

received from investors was siphoned to entities controlled by the Individual Defendants and

Relief Defendants or simply withdrawn as cash.  In simple terms, Defendants treated dozens of

elderly investors as their personal ATM machines.

4.      The Defendants fraudulently obtained at least $9 million from over 300 investors

during the Relevant Period.  In one particularly egregious case, Damon and Malloy spent months

earning the trust of an elderly veteran in order to defraud him of $300,000.

5.      In many cases, the Individual Defendants provided investors with misleading account statements showing that the shares the investors purchased were being held for safekeeping in their Premier Links accounts awaiting the promised IPOs.  In fact, many of the investors' purported purchases of shares are not reflected in the transfer agent records for the relevant companies, indicating that shares were never purchased for these investors and that the Individual Defendants simply stole the investors' money.

6.      As a result of this conduct, Defendants violated the anti-fraud provisions of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").  By acting as a broker-dealer without being registered as, or associated with, a registered broker-dealer, Defendants also violated the broker-dealer registration provisions of the Exchange Act.   By offering and selling securities for which no registration statement was in effect, and for which no exemption from registration was available, Defendants also violated Section 5 of the Securities Act.

7.      The Commission seeks permanent injunctions against the Defendants, disgorgement of ill-gotten gains and prejudgment interest thereon from the Defendants and Relief Defendants, and civil monetary penalties from the Defendants.

## VIOLATIONS

8.      By virtue of the conduct alleged herein, the Defendants have violated Sections 5(a), 5(c), and 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a) and (c), and §77q(a).  Defendants also violated Sections 10(b) and 15(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78o(a), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

9.      Unless the Defendants are permanently restrained and enjoined, they each will again engage in the acts, practices, and courses of conduct set forth in this Complaint, or in acts and transactions of similar type and object.

## JURISDICTION AND VENUE

10.     The Commission brings this action pursuant to the authority conferred by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

11.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Sections 21(e) and 27 of the Exchange Act, 15 U.S.C. § 78u(e) and 78aa.  Defendants, directly or indirectly, singly or in concert, have made use of the means or instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

12.     Venue lies in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, in that certain of the transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the Eastern District of New York.  Among other things, Defendants solicited investments in securities from Premier Links' location in this District.

## FACTS

### Defendants

13.     **Premier Links** is a New York corporation that during the Relevant Period maintained a place of business in Staten Island, New York, and held itself out as a broker-dealer, although it has never been registered with the Commission as a broker-dealer or in any other capacity.

14.     **Malloy** was the President of Premier Links from at least August 2007 to the end of the Relevant Period.  He was also a sales representative and solicited investments in unregistered securities on behalf of Premier Links throughout the Relevant Period.  Malloy

resides in Staten Island, New York.  He has never been registered with the Commission in any capacity.

15.     **Damon** was a sales representative and solicited investments in unregistered securities on behalf of Premier Links during the Relevant Period.  He is believed to reside in Queens, New York.  Damon has never been registered with the Commission in any capacity.

16.     **Ruffin** was a sales representative and solicited investments in unregistered securities on behalf of Premier Links during the Relevant Period.  He is believed to reside in Queens, New York.  Ruffin has never been registered with the Commission in any capacity.

### Relief Defendants

17.     **DeSantis** was affiliated with Premier links during the Relevant Period.  He received at least $893,290 in misappropriated investor funds from Premier Links that were diverted to NYC Claims, a New York corporation which he and Bloome controlled.  DeSantis resides in Staten Island, New York.

18.     **Bloome** was affiliated with Premier Links throughout the Relevant Period.   He received at least $500,000 in misappropriated investor funds through checks made payable to cash and cash withdrawals from Premier Links, and at least $893,290 in misappropriated investor funds diverted to NYC Claims, which he and DeSantis controlled.  Bloome resides in Staten Island, New York.

19.     **Byrne** received at least $57,025 in misappropriated investor funds through payments from Premier Links.  In addition, Byrne received approximately $497,850 in misappropriated investor funds from Premier Links through cashiers' checks made out to Quatro Holdings, a New York corporation he controlled, and $418,200 through checks and cashiers'

checks made out to "Jo May Linens," but which were endorsed by Byrne.  He resides in Staten Island, New York.

20.     **Spinelli** was the President of Premier Links from at least December 2005 through September 2007.  He received at least $458,560 in misappropriated investor funds through checks from the primary Premier Links account and signed for over $250,000 in cash withdrawals and checks made payable to cash from that account.  Throughout the Relevant Period, he was also the sole authorized signer on the secondary Premier Links bank account, which received over $500,000 in investor funds, although he and Amatulli shared actual control over that account.  Spinelli is believed to reside in Staten Island, New York.

21.     **Amatulli** was affiliated with Premier Links during the Relevant Period.  Among other things, she acted as Premier Links' receptionist.  Amatulli received at least $25,000 in misappropriated investor funds through checks from the primary Premier Links account.  In addition, it appears she exercised control over the secondary Premier Links bank account that received over $500,000 in investor funds, much of which was withdrawn in cash or spent for her benefit.  Amatulli resides in Brooklyn, New York.

22.     **Jackson** was affiliated with Premier Links during the Relevant Period.  He received at least $197,500 in misappropriated investor funds through checks from Premier Links.  Jackson is believed to reside in Hudson, New York.

23.     **Anderson** was affiliated with Premier Links during the Relevant Period.  He received at least $74,000 in misappropriated investor funds through checks from Premier Links.  Anderson is believed to reside in Queens, New York.

24.     **NYC Claims** is a New York corporation controlled by DeSantis and Bloome with no known substantive business operations.  At least $893,290 of investor funds was diverted from Premier Links to NYC Claims.

25.     **Quatro Holdings** is an active New York corporation controlled by Byrne with no known substantive business operations.  At least $497,850 of investor funds was diverted from Premier Links to Quatro Holdings.

## Background

26.     Premier Links operated an unregistered broker-dealer from leased space in an industrial office park located at 16 Shenandoah Avenue, Staten Island.   The Individual Defendants, who all worked at Premier Links, directed their sales efforts at vulnerable elderly investors by selecting their names from a list they maintained and cold-calling them.  When they established telephone contact with a prospective investor, the Individual Defendants aggressively pitched the proposed investments in speculative microcap and other companies and sought to build a relationship of trust and confidence with the prospective investor.  After the investors agreed to invest, the Individual Defendants then repeatedly called them to pitch new investments. Defendants used these high-pressure sales tactics to sell the unregistered securities of at least four companies, two of which were never publicly traded: Axiologix Education Corporation ("Axiologix"), Edumedia Software Solutions Corp. ("Edumedia"), Axiologix Holdings, Inc. ("Axiologix Holdings"), and Digital Processing Solutions ("Digital") (collectively the "Issuers"). Defendants misappropriated over 90% of the proceeds from the sale of the unregistered stock of the Issuers.

## Axiologix

27.     Axiologix is a Nevada corporation currently headquartered in Atlanta, Georgia. During the Relevant Period, Axiologix was a self-described development stage company headquartered in Bedminster, New Jersey that purported to be in the educational software and services business.

28.     During the Relevant Period, the company's shares were at times quoted on the OTC-Pink marketplace of the OTC Markets Group, LLC or its predecessor, Pink Sheets LLC, under the symbol "AXLX."

29.     Axiologix filed an S-1 registration statement in connection with a public offering of certain shares of common stock that went effective on March 15, 2010.  In October 2011, Axiologix filed a Notice of Termination of Registration under Section 12(g) of the Exchange Act and has not filed reports with the Commission since that date.

30.     Each of the Individual Defendants pitched investments in Axiologix by telling prospective investors, among other things, that Premier Links was selling pre-IPO shares.  The Individual Defendants assured prospective investors that by buying shares at low prices, they would profit when the share price soared after the soon-to-be conducted IPO.

## Axiologix Holdings

31.     Axiologix Holdings, Inc. ("Axiologix Holdings") was a private Nevada company based in Egg Harbor Township, New Jersey and controlled during the Relevant Period by the same individual who served as CEO and President of Axiologix.  The Nevada Secretary of State revoked the company's charter in 2009.  Since at least 2010, it purported to be Axiologix's subsidiary, but it had no substantive operations and simply maintained bank accounts and issued Axiologix share certificates.

32.     Premier Links sales representatives pitched unregistered stock of Axiologix Holdings from at least 2009 through 2010.  The sales representatives, who used the names Axiologix Holdings and Axiologix interchangeably when pitching the shares to investors, falsely told investors that Axiologix Holdings would imminently engage in an IPO.

### Edumedia

33.     Edumedia is a self-described computer hardware and software technology supplier based in Marmora, New Jersey.  During the Relevant Period, it was controlled by the same individual who served as CEO and President of Axiologix.

34.     In January 2001, Edumedia filed an Amended Form 10SB12G to register some of its securities with the Commission pursuant to Section 12(g) of the Exchange Act, but then failed to file its required annual and quarterly reports during the Relevant Period.  Edumedia terminated its registration in March 2008.  Edumedia described itself as a computer hardware and software supplier in the business of providing technology solutions to kindergarten through 12th grade educational institutions, real estate and law firms, and other business clients.

35.     Prior to 2012, each of the Individual Defendants induced investors to purchase shares of Edumedia by characterizing it as a promising educational software company that was on the brink of an IPO.  Beginning in at least May 2012, each of the Individual Defendants pitched investors to purchase unregistered shares of Edumedia by telling them that the company was going to go public within six months.

### Digital

36.     Digital was a privately held Texas corporation based in Melville, New York that was known as Merchant Media Solutions, Inc. ("Merchant Media") until it changed its name to

Digital Processing Solutions in March 2008.  Digital purportedly provided digital payment processing services.

37.     Premier Links purchased large blocks of unregistered Merchant Media and Digital shares directly from the company and then from at least 2009 through 2011 purported to sell portions of those shares to investors.  To induce investors to purchase the shares, sales representatives of Premier Links, including each of the Individual Defendants, falsely told investors that the company's stock had previously publicly traded under the ticker symbol MHSU and would soon begin trading under the ticker symbol DPSO.

### Defendants' Misappropriation Scheme

38.     Since December 2005, Defendants induced investors to entrust Premier Links with at least $9.3 million to purchase unregistered stock in the Issuers, including at least $4 million received since January 2010.  Investors sent funds via wire transfer or personal check to two accounts maintained by Premier Links to invest in the Issuers pitched by Premier Links sales representatives, including the Individual Defendants.  Almost immediately thereafter, most of the funds were diverted to entities or persons connected to the Defendants and the Relief Defendants.  In order to conceal and mask their misappropriation, the Defendants converted a significant portion of the funds into cash or transferred funds by check into entities that were controlled by the Defendants and Relief Defendants but had no substantive operations.  Only $614,070 of the $9.3 million raised from the sale of stock in the Issuers, or less than 10 percent, was ultimately provided to the Issuers.

39.     The primary Premier Links account received approximately $8.8 million in investor funds since December 2005, including at least $3.6 million received since January

2010.  Spinelli (starting in December 2005), Malloy (starting in August 2007), and Bloome (starting in May 2010) all had signature authority over this account through at least May 2012.

40.     As investor funds were received in the Premier Links account, the majority of the funds were transferred as follows:

    a)  $1,411,087 to cash,  including:

        1.  $904,177 in checks written to cash, (at least $56,700 endorsed by Spinelli, $338,450 endorsed by Bloome and $383,200 endorsed by Malloy);

        2.  $503,344 in teller cash withdrawals (at least $127,112 by Malloy, $176,256 by Bloome and $199,975 by Spinelli), and

        3.  $3,566 in ATM withdrawals;

    b)  $1,413,175 in checks or bank transfers to Malloy (including $475,425 to Malloy individually and $937,750 to D Biggest Corp., an account controlled by Malloy);

    c)  $1,600,000 (approximately) spent by Premier Links on goods and services, including Premier Links' apparent overhead expenses and hundreds of thousands of dollars on apparent personal goods and services, such as airline tickets, hotel rooms, credit card payments, Walt Disney World reservations and tickets, car payments, gas stations, retail shopping (Bloomingdales, Gucci, Coach, Nordstrom), phone and cable bills, parking fines, rent and other items;

    d)  $893,290 in checks or bank transfers to NYC Claims;

    e)  $400,000 (approximately) returned to investors;

f) $614,070 to the companies whose stock was sold by Premier Links (including $246,170 to Axiologix, $244,600 to Axiologix Holdings, and $48,300 to Digital);

g) $497,850 to Quatro Holdings, primarily in the form of cashiers' checks, many of which were ordered by Bloome (which were then endorsed by Byrne);

h) $418,200 in the form of checks or cashiers' checks to "Jo May Linens" (most of which were then endorsed by Byrne);

i) $458,562 in checks to Spinelli;

j) $57,025 in checks to Byrne;

k) $29,150 in checks to Jackson;

l) $25,116 in checks to Amatulli;

m) $18,150 in checks to Damon;

n) $17,065 in checks to Ruffin;

o) $1,050 in checks to Anderson;

p) $600,000 (approximately) to other individuals with apparent ties to Premier Links.

41.     A second Premier Links account received an additional $518,186 in investor funds from May 2007 (when the account was opened) through March 2012, including at least $316,000 received since January 2010.  Spinelli had sole signing authority over this account from May 2007 to the present, but Amatulli also exercised control over the account.  The statements for this secondary bank account were sent to Amatulli's home address, and Amatulli deposited investor funds in the account and withdrew investor funds in $700 increments via ATM withdrawals on multiple occasions in 2012.

42.     As investor funds were received in the second Premier Links account, the majority of the funds were distributed as follows:

a) $334,018 was converted to cash (primarily through over 900 separate ATM withdrawals, many of which were in $700 increments, including the ATM withdrawals from this account made by Amatulli in 2012);

b) $144,578 for purchases of apparent personal goods and services, primarily by debit card or online bill payment, including retail shopping (Bloomingdales, the Gap, Macy's, Kohls, Old Navy, Century 21, Pathmark, Rite Aid, Party City, Target, Home Depot, Toys R Us, Gamestop), restaurants, gas stations, credit card payments, residential rent payments, car payments, cable and phone bills (at least $20,953 of these were online bill payments that specifically referenced Amatulli, including car payments to Ford Credit, Verizon, and Public Storage);

c) $8,200 by check to Anderson;

d) $7,430 by check to Spinelli.

43.     The $937,750 of investor funds funneled to Malloy, in the name of his alter ego company, "D Biggest Corp." from the primary Premier Links account were further distributed by Malloy for his own uses or to other Defendants and Relief Defendants. The investor funds sent to Malloy's D Biggest Corp account were primarily distributed as follows:

a) $266,167 converted to cash (including $191,997 in ATM withdrawals, $14,370 in checks paid to cash, and $59,800 in other cash withdrawals);

b) $253,761 in various purchases, mostly apparent personal expenses of Malloy, including his condominium, utility and loan payments, Ford automobile payments, and a variety of debit card purchases;

c) $168,350 in checks to Jackson;

    d)  $87,753 in checks to Damon;

    e)  $66,498 in checks to Anderson;

    f)  $33,870 in checks to Ruffin;

    g)  $5,955 in checks to Bloome;

    h)  $940 in checks to Amatulli; and

    i)  $46,753 in checks to other individuals with apparent ties to Premier Links.

### Defendants' Misrepresentations and Omissions

44.    From at least December 2005 through August 2012, Premier Links' sales representatives, including each of the Individual Defendants, used the same formula to induce investors to purchase stock in the Issuers.  The sales representatives, including each of the Individual Defendants, stated that each company would soon conduct an IPO and that by buying shares at low pre-IPO prices, investors would profit when the share price soared after the IPO.

45.    The Defendants never disclosed to the investors that the vast majority of the funds they transmitted to Premier Links to purchase stock in the Issuers would never be sent to those companies, but would instead be spent by Premier Links for its own purposes or otherwise used by the Individual Defendants, the Relief Defendants and other affiliated individuals and entities. Each solicitation of funds by the Defendants was rendered misleading because of this material omission regarding the use of funds.

46.    In many cases, prospective investors were provided with and signed an Agreement to Purchase ("Stock Purchase Agreement") which stated, among other things: "*I understand that Premier Links, Inc. will arrange to have the company transfer agent effect the issuance of the shares from Premier Links, Inc. and the shares certificate representing this purchase will be sent to me at the address below.*"  The Stock Purchase Agreements were typically accompanied by a cover letter signed by Malloy in his capacity as President of Premier

Links.  Contrary to the representations made in the Stock Purchase Agreement, Premier Links often did not arrange to have the transfer agent effect the issuance of the shares and many investors never received share certificates.

47.     At least 300 investors from over 40 states sent funds to Premier Links to purchase unregistered shares of the Issuers.  The following five investors are representative examples of victims of the Defendants' scheme.  In each instance, the Defendants' solicitations were materially misleading because the Defendants failed to disclose that most of the funds sent to purchase stock in the Issuers would not be used for that purpose and would simply be misappropriated.

### Investor A – A 76-year-old retiree

48.     In May 2011, Malloy and Damon began pitching investments over the telephone to a 76-year-old Minnesota retiree ("Investor A").  Damon first contacted Investor A by cold-calling him.  After Investor A sent a $2,000 check to purchase shares of Axiologix, Damon subsequently pitched an investment in Edumedia stock and introduced Investor A to Malloy over the phone to reinforce Damon's sales points.

49.     Damon and Malloy told Investor A that Edumedia would soon conduct an IPO and that when the IPO occurred, the share price would increase.  Neither Damon nor Malloy told Investor A that they had no reasonable basis for these representations and that the Defendants would simply misappropriate most, if not all, of the money he sent to purchase Edumedia shares.

50.     Investor A was solicited by Damon and Malloy shortly before Premier Links received funds from Investor A to purchase stock in Axiologix and Edumedia on the following dates:

- 5/27/11 - $2,000 check
- 9/8/11 - $3,000 check

- 11/23/11 - $2,866.70 check
- 1/27/12 - $2,400 check

51.     Investor A has never realized the promised return – and in fact has received no return – on his investments with Premier Links and lost all of the over $10,000 he invested with Premier Links.

*Investor B – An 88-year-old retired farmer*

52.     Beginning in 2007 through May 2012, Ruffin repeatedly solicited investments from an 88-year-old retired Maryland farmer ("Investor B"). As a result of Ruffin's repeated telephone solicitations, Investor B sent checks to purchase shares in several speculative companies, including Axiologix and Edumedia.

53.     For each sale, Ruffin told Investor B that the companies were poised to conduct IPOs and that if Investor B immediately bought shares at a low price, he would lock in profits after the shares increased in value following the IPO. Ruffin never disclosed to Investor B that he had no reasonable basis for these representations and that Ruffin and other Defendants would simply misappropriate most, if not all, of the funds sent by Investor B to purchase stocks.

54.     For example, beginning in 2009 or 2010, Ruffin solicited investments by investors in Axiologix based on representations that it was going to conduct an IPO and the price would thereafter rise. Based on Ruffin's representations, throughout 2010 Investor B wired Premier Links thousands of dollars to purchase what he understood to be over 100,000 shares of Axiologix stock. However, according to the financial statement Investor B later received from Premier Links, he was instead sold shares of Axiologix Holdings. Axiologix has no record that Investor B was ever a shareholder of Axiologix.

55.     In late 2011, Ruffin induced Investor B to purchase shares of Edumedia at $0.10 per share by telling Investor B that the company would soon be conducting an IPO. Ruffin never

disclosed to Investor B that he had no basis for this representation and that Ruffin and other

Defendants would simply misappropriate most, if not all, of the funds sent by Investor B to

purchase Edumedia stock.

56.     Investor B was solicited by one or more of the Individual Defendants to purchase

stock in Axiologix and Edumedia shortly before the dates on which Premier Links received

funds from Investor B:

- 10/29/07 - $1,500 check
- 2/19/08 - $6,250 check
- 3/4/08 - $5,625 check
- 4/9/08 - $3,000 check
- 4/23/08 - $7,200 check
- 2/11/09 - $5,400 check
- 5/27/10 - $26,400 wire transfer
- 6/14/10 - $9,000 wire transfer
- 9/7/10 - $6,000 wire transfer
- 9/23/10 - $3,822.40 wire transfer
- 10/22/10 - $15,000 check
- 12/20/11 - $3,043.30 check

57.     Investor B has never realized the promised return – and in fact has received no

return – on his investments with Premier Links and lost all of the over $90,000 he invested with

Premier Links.

### Investor C – A 76- year-old Air Force veteran

58.     In 2008 Damon cold-called a 76-year-old Air Force veteran in Tennessee

("Investor C").  After Investor C's initial investment in March 2009, Damon and Ruffin

contacted the investor on a regular basis to purchase shares of Axiologix, Axiologix Holdings,

and Digital.  Beginning in about 2011, Ruffin replaced Damon as the principal contact for

Investor C.   Neither Damon nor Ruffin told Investor C that the Defendants would simply

misappropriate most, if not all, of the money he sent to purchase shares.

59.     Investor C was solicited to purchase stock by one or more of the Individual

Defendants shortly before dates on which Premier Links received funds from Investor C:

- 3/3/09 - $1,200 check
- 3/10/09 - $5,000 check
- 3/20/09 - $14,400 check
- 3/27/09 - $5,000 check
- 5/1/09 - $8,100 wire transfer
- 6/2/09 - $4,500 wire transfer
- 6/29/09 - $10,000 wire transfer
- 7/17/09 - $9,500 wire transfer
- 7/28/09 - $10,800 wire transfer
- 8/14/09 - $10,000 wire transfer
- 8/28/09 - $12,690 wire transfer
- 10/13/09 - $9,000 check
- 11/16/09 - $13,500 check
- 12/11/09 - $9,000 wire transfer
- 1/19/10 - $13,500 check
- 2/12/10 - $10,000 wire transfer
- 3/8/10 - $9,000 wire transfer
- 4/23/10 - $15,000 wire transfer
- 5/17/10 - $24,750 wire transfer
- 7/9/10 - $9,000 wire transfer
- 8/20/10 - $5,000 wire transfer
- 8/31/11 - $3,000 check
- 10/21/11 - $10,000 wire transfer
- 10/27/11 - $10,000 wire transfer
- 11/1/11 - $7,000 wire transfer
- 11/10/11 - $7,860 wire transfer
- 11/28/11 - $6,280 wire transfer
- 12/2/11 - $10,000 wire transfer
- 12/9/11 - $6,000 wire transfer
- 12/13/11 - $4,000 wire transfer
- 1/19/12 - $10,000 wire transfer
- 2/2/12 - $2,500 wire transfer
- 2/17/12 - $5,000 wire transfer
- 3/2/12 - $10,000 wire transfer

60.     Although Premier Links sent Investor C account statements purportedly listing his

holdings, Investor C has never received share certificates reflecting his investments despite

receiving written documents from Premier Links – signed by Malloy – indicating that he would

receive the shares. According to Axiologix and Digital records, Investor C was never issued

shares of those companies; instead Defendants simply misappropriated the money he sent to

Premier Links.

61.    Investor C has received no return on his investments with Premier Links and lost

all of the approximately $300,000 he invested with Premier Links.

### Investor D – A 68-year-old Texas Retiree

62.    In or about July 2010, Damon contacted a 68-year-old retiree living in Texas

("Investor D"). Damon solicited Investor D to purchase the purported pre-IPO shares of

Axiologix, telling Investor D that Axiologix would soon go public and predicting that the shares

would be worth considerably more after the IPO. In July 2010, Investor D purchased 5,000

shares of Axiologix at $.45 per share, for a total of $2,250. Damon never disclosed to Investor D

that he had no reasonable basis for these representations and that Damon and the other

Defendants would simply misappropriate most, if not all, of the money he sent to purchase

Axiologix shares.

63.    In November 2010, Damon solicited Investor D to purchase shares of Digital at

$.60 per share, and Investor D purchased 5,000 shares of Digital for $3,000. Damon never told

Investor D that the Defendants would simply misappropriate most, if not all, of the money he

sent to purchase shares.

64.    Investor D has received no return on his investments with Premier Links and lost

all of the $5,250 he invested with Premier Links.

### Investor E – A 75-year-old Pennsylvania Retiree

65.    In January 2007, Premier Links sales representatives cold-called a 75-year-old

retiree in Pennsylvania ("Investor E"). Malloy and Ruffin were Investor E's contacts at Premier

Links.

66.     From January 2007 through at least March 2012, Malloy and Ruffin solicited

multiple investments in Axiologix Holdings and Edumedia from Investor E.  To induce Investor

E to make these investments, Malloy and Ruffin told Investor E that these companies would each

be conducting an IPO in the near future and that after the IPOs occurred, Investor E would make

a significant profit.  Malloy and Ruffin never told Investor E that they had no reasonable basis

for these representations and that the Defendants would misappropriate most, if not all, of the

money he sent to Premier Links to purchase the securities.

67.     As a result of these solicitations, from December 2009 through April 2010,

Investor E sent over $30,000 to Premier Links to purchase shares of Axiologix Holdings.  From

August 2011 through 2012, Premier Links' representatives solicited investments in Edumedia

stock from Investor E.  In early 2012, Ruffin induced Investor E to purchase shares of Edumedia

but failed to tell him that the Defendants would misappropriate most, if not all, of the money he

sent to purchase the securities.

68.     Investor E was solicited by one or more of the Individual Defendants to purchase

stock in one or more of the Issuers shortly before the dates on which Premier Links received

funds from Investor E:

- 6/22/07 - $2,750 check
- 10/18/07 - $6,000 check
- 1/14/08 - $5,000 check
- 3/12/08 - $10,125 check
- 7/7/08 - $7,200 check
- 8/26/08 - $4,000 check
- 10/23/08 - $3,000 check
- 12/12/08 - $3,000 check
- 12/3/09 - $13,500 wire transfer
- 12/22/09 - $9,000 check
- 2/9/10 - $2,645 wire transfer
- 3/10/10 - $5,000 wire transfer
- 4/23/10 - $3,000 wire transfer
- 6/10/10 - $9,611.55 wire transfer

- 12/20/10 - $5,514.30 wire transfer
- 3/21/11 - $7,131.65 wire transfer
- 8/26/11 - $6,245 wire transfer
- 12/2/11 - $2,649.60 wire transfer
- 1/20/12 - $10,000 wire transfer

69.     Investor E has received no return on his investments with Premier Links and lost all of the over $100,000 he invested with Premier Links.

## Defendants Provided Misleading Account Statements and Failed to Deliver Promised Share Certificates

70.     Premier Links sent Investors B, D, and E crude account statements purportedly listing those investors' holdings.  In some instances, these account statements contained false information about the investors' holdings, listing securities that were never purchased at values that bore no relation to actual market prices.  For example, the account statements provided to Investors B (in April 2012) and E (in February 2012) listed holdings of Axiologix Holdings and Edumedia as "positions" in their accounts, when in reality Premier Links had not arranged for the investor to actually purchase any shares of those companies.

71.     Some investors never received any share certificates or other documentation of their investments whatsoever.  For example, Investor C never received share certificates reflecting his purported investments in Axiologix.  When some investors contacted the companies' transfer agents about their share certificates, they were told that there was no record of any shares in the investor's name.  For example, Investor D wired $2,250 to Premier Links in July 2010 to purchase Axiologix shares, but did not receive a share certificate for many months despite his repeated requests.  Only after he called to complain to Axiologix's management and transfer agent, did Investor D learn that Premier Links had never arranged, as it had represented to him, to have the Axiologix shares issued to him.  After his complaints, Investor D received the Axiologix share certificates in March 2011.

## Defendants Failed to Register as Brokers or Dealers

72.     During the Relevant Period, Premier Links and Malloy, Damon and Ruffin, on behalf of Premier Links, sold securities while acting as unregistered brokers.  Among other things, Premier Links representatives, including Malloy, Damon and Ruffin, used the telephone and the mails to effect purchases and sales of securities for the account of others, as described above.

73.     During the Relevant Period, Premier Links was never registered with the Commission as a broker-dealer, and Malloy, Damon and Ruffin were never associated with a broker-dealer registered with the Commission.

74.     Premier Links and Malloy, Damon and Ruffin, on behalf of Premier Links, actively solicited investors to purchase securities, provided advice to potential investors, made representations as to the merits of investing in the securities, and received compensation for selling securities in the form of a portion of funds received from investors.

75.     All of the money the Defendants received from investors resulted from operating an unregistered broker-dealer, which was Premier Links' sole business and only source of revenue.

## Defendants Illegally Offered and Sold Unregistered Shares

76.     During the Relevant Period, as described above, Premier Links and the Individual Defendants illegally sold and offered to sell shares of the Issuers for which no registration statement was in effect.

77.     No registration statement was effective during the Relevant Period with respect to Defendants' sales of Edumedia, Axiologix Holdings and Digital stock, and the sales failed to qualify for an exemption from registration.

78.     Although Axiologix registered an offering of its common stock in March 2010, this registration does not apply to Defendants' sales of Axiologix stock.  By engaging in a general solicitation and distribution to the public, by purporting to offer and sell pre-IPO shares, and by selling shares in violation of and outside of the times permitted in the registered offering, Defendants did not comply with the terms of the registration statement.

79.     No exemption applies to Defendants' sales of unregistered stock because the offers and sales were conducted by means of a general solicitation to numerous unaccredited and unsophisticated investors.

80.     Defendants used interstate means in connection with their offers and sales, specifically, they cold-called and solicited investments over the telephone and sent stock subscription agreements, share certificates and account statements via mail and express delivery services.

### FIRST CLAIM FOR RELIEF

### Violations of Section 5(a) and (c) of the Securities Act
(Sale of unregistered securities against all Defendants)

81.     Paragraphs 1 through 80 are re-alleged and reincorporated by reference as if fully set forth herein.

82.     The Defendants, directly or indirectly, singly and/or in concert with others, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer and sell securities through the use or medium of a prospectus or otherwise, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

83.     By reason of the foregoing, the Defendants have violated and unless restrained and enjoined will continue to violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) & (c).

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act
(Material misrepresentations and/or omissions against all Defendants)

84.     Paragraphs 1 through 83 are re-alleged and reincorporated by reference as if fully set forth herein.

85.     Defendants' representations and omissions concerning the use of investor funds were material.

86.     Throughout the Relevant Period, including from at least January 2010 through the present, the Defendants, directly and indirectly, singly and/or in concert, knowingly or recklessly, by the use of the means and instruments of transportation or communication in interstate commerce or by the use of the mails, and in connection with the offer or sale of securities, have: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of one or more untrue statements of material fact or one or more omissions of material fact necessary to make the statements, in light of the circumstances under which they were made, not misleading; or (c) engaged in one or more transactions, acts, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers.

87.     By reason of the transactions, acts, omissions, practices, and courses of business set forth in this Complaint, the Defendants have violated, are violating, and unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## THIRD CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)
(Scheme to defraud against all Defendants)

88.     Paragraphs 1 through 87 are re-alleged and reincorporated by reference as if fully set forth herein.

89.     Throughout the Relevant Period, including from at least January 2010 through the present, the Defendants, directly and indirectly, singly and/or in concert, knowingly or recklessly, by the use of any means or instrumentality of interstate commerce or of the mails, and in connection with the purchase or sale of securities, have employed devices, schemes or artifices to defraud and/or engaged in one or more acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person.

90.     By reason of the acts, omissions, practices, and courses of business set forth in this Complaint, the Defendants have violated, are violating, and unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a) and (c).

## FOURTH CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)
(Material misrepresentations and/or omissions against all Defendants)

91.     Paragraphs 1 through 90 are re-alleged and reincorporated by reference as if fully set forth herein.

92.     Defendants' representations and omissions concerning the use of investor funds were material.

93.     Throughout the Relevant Period, including from at least January 2010 through the present, the Defendants, directly and indirectly, singly and/or in concert, knowingly or

recklessly, by the use of any means or instrumentality of interstate commerce or of the mails, and in connection with the purchase or sale of securities, have made one or more untrue statements of material fact or one or more omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

94.     By reason of the acts, omissions, practices, and courses of business set forth in this Complaint, the Defendants have violated, are violating, and unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## FIFTH CLAIM FOR RELIEF

### Acting as an Unregistered Broker-Dealer in Violation of Section 15(a) of the Exchange Act
(Against all Defendants)

95.     Paragraphs 1 through 94 are re-alleged and reincorporated by reference as if fully set forth herein.

96.     The Defendants have solicited purchases of and effected transactions in securities and have received compensation based on those transactions. The Defendants were not registered with the Commission as a broker or dealer, and the Defendants were not associated persons of a registered broker or dealer with respect to the conduct alleged in this Complaint.

97.     By engaging in the conduct described above, the Defendants made use of the mails or means or instrumentalities of interstate commerce to effect transactions in or to induce or attempt to induce the purchase or sale of securities (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) without registering as a broker or dealer or as associated persons of a registered broker dealer in accordance with Section 15 of the Exchange Act, 15 U.S.C. § 78o(a).

98.     By reason of the foregoing, the Defendants have violated and unless restrained and enjoined will continue to violate Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

<strong><u>SIXTH CLAIM FOR RELIEF</u></strong>
(Unjust Enrichment Against Relief Defendants)

99.     Paragraphs 1 through 98 are re-alleged and reincorporated by reference as if fully set forth herein.

100.    Relief Defendants DeSantis, Bloome, Byrne, Spinelli, Amatulli, Jackson, Anderson, Quatro Holdings, and NYC Claims have each, directly or indirectly, obtained investor funds from the fraudulent and illegal sales of securities alleged above under circumstances in which it is not just, equitable, or conscionable for the Relief Defendants to retain these ill-gotten gains.  The Relief Defendants gave no legitimate consideration for their receipt of these ill-gotten gains and have no legitimate claim to these funds.  The Relief Defendants have therefore each been unjustly enriched.

101.    The Commission is entitled to an order, pursuant to common law equitable principles and pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)], requiring the Relief Defendants, and each of them, to disgorge all of the proceeds of the illegal activities described herein that each has received or from which each has benefitted, either directly or indirectly.

<strong><u>PRAYER FOR RELIEF</u></strong>

**WHEREFORE**, the Commission respectfully requests that the Court enter a judgment:

**I.**

Finding that Defendants each violated the securities laws and rules promulgated thereunder as alleged against them herein;

**II.**

Permanently enjoining and restraining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing future violations of Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), (c) and 77q(a)], Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], or alternatively, from aiding and abetting such future violations, as respectively alleged against them herein.

**III.**

Ordering Defendants, and each of them, to disgorge all ill-gotten gains obtained through the unlawful conduct describe above, plus prejudgment interest.

**IV.**

Ordering the Relief Defendants and each of them, to disgorge all funds each received, directly or indirectly, from the Defendants' unlawful conduct, together with prejudgment interest thereon.

**V.**

Ordering the Defendants, and each of them, to pay an appropriate civil money penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**VI.**

Granting such other and further relief as this Court deems just and proper.

Dated:     December 18, 2014
           New York, New York

Andrew M. Calamari
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Plaza, 200 Vesey Street
New York, New York 10281-1022
Telephone: (212) 336-0080 (Brody)
Fax: (212) 336-1324
brodyt@sec.gov

*Of Counsel:*
Amelia A. Cottrell
Thomas P. Smith, Jr.
Todd D. Brody
Joshua Newville
Peter A. Pizzani, Jr.