**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------------X
SECURITIES & EXCHANGE COMMISSION,

                      Plaintiff,

     -against-

PREMIER LINKS, INC., THEIRRY RUFFIN
a/k/a THEIRRY REGAN, DWAYNE MALLOY,
CHRISTOPHER DAMON,

               Defendants,          **REPORT AND RECOMMENDATION**

     -and-                               **14-CV-7375 (CBA) (ST)**

JOHN DESANTIS, ROBERT BLOOME,
JOSEPH J. BYRNE, NICHOLAS SPINELLI,
MARGARET RAVA a/k/a MARGARET
AMATULLI, DARNEL JACKSON, FREDDIE
ANDERSON, QUATRO HOLDINGS, INC.,
and NYC CLAIMS, INC.,

              Relief Defendants.
--------------------------------------------------------------X
**TISCIONE, United States Magistrate Judge:**

      Plaintiff Securities & Exchange Commission (the "SEC") brought an enforcement action

against Premier Links, Inc. ("Premier Links"), a number of individuals affiliated with defendant

Premier Links, and two entities that are each affiliated with one or more of these individuals, on

December 18, 2014. *See generally* Dkt. No. 1 ("Compl." or the "Complaint"). The SEC alleged

violations of the Securities Act of 1933, 15 U.S.C. §§ 77a *et seq.* (the "Securities Act"), of the

Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.* (the "Exchange Act" and, together

with the Securities Act, the "Acts"), and of rules promulgated thereunder ("Rule 10b-5"). *See*

*generally id.* The SEC seeks a permanent injunction to prevent certain defendants from violating

the Securities Act, the Exchange Act, and Rule 10b-5, disgorgement of any ill-gotten gains, and imposition of a civil monetary penalty upon certain defendants. *Id.*

Defendants in this case can be broken into two categories. First, Premier Links, Christopher Damon, Dwayne Malloy, and Theirry Ruffin a/k/a Theirry Regan (collectively, the "Premier Links Defendants") are alleged to have been directly involved in misconduct at Premier Links. Second, Freddie Anderson, Robert Bloome, Joseph J. Byrne, John DeSantis, Darnel Jackson, Margaret Rava a/k/a Margaret Amatulli, Nicholas Spinelli, Quatro Holdings, Inc. ("Quatro"), and NYC Claims, Inc. ("NYC Claims," and together with Mr. Anderson, Mr. Bloome, Mr. Byrne, Mr. DeSantis, Mr. Jackson, Ms. Rava, Mr. Spinelli, and Quatro, the "Relief Defendants") are individuals who were affiliated with Premier Links (or entities affiliated with those individuals) and allegedly benefited from the Premier Links Defendants' misconduct.

Several defendants appeared in this action: Mr. Jackson filed an answer on February 13, 2015 (Dkt. No. 6); Mr. DeSantis filed an answer on April 3, 2015 (Dkt. No. 14); and NYC Claims, an entity allegedly controlled by Mr. DeSantis and Mr. Bloome (*see* Compl. ¶ 24), an individual defendant who has not appeared in this action, filed an answer on June 1, 2015 (Dkt. No. 27).[1] The remaining defendants, including Mr. Spinelli and Mr. Bloome, have failed to appear, answer, or otherwise respond to the Complaint despite proper service (the "Defaulting Defendants").[2] *See* Dkt. Nos. 8, 19, 21, 28 to 34, 40-3, 40-6, 40-12, 56; *see also* Dkt. No. 24 (Order) (granting motion for service by publication).

---

[1]     Mr. Spinelli filed a letter through his criminal defense lawyer to report that he would not be answering the Complaint in this case. Dkt. No. 43 (Letter); *see also* Dkt. No. 45 (Status Report). On May 17, 2016, the Clerk of the Court entered a certificate of default against Mr. Spinelli. Dkt. No. 62.

[2]     The individuals and entity who are both Defaulting Defendants and Relief Defendants are hereinafter referred to as the "Defaulting Relief Defendants." For the sake of clarity, they are: Mr. Anderson, Mr. Bloome, Mr. Byrne, Ms. Rava, Mr. Spinelli, and Quatro.

The SEC requested entry of certificates of default by the Clerk of the Court against the Defaulting Defendants on November 25, 2015 and March 21, 2016 (Dkt. Nos. 40 & 56), and the Clerk of Court entered defaults against the Defaulting Defendants on February 22, 2016, February 23, 2016, and May 17, 2016 (Dkt. Nos. 48-55, 61, 62). On June 16, 2016, the SEC moved for default judgment against the Defaulting Defendants. Dkt. No. 64. On March 8, 2017, following requests from Mr. DeSantis (Dkt. No. 68) and Mr. Jackson (Dkt. No. 69), the Honorable Carol Bagley Amon stayed the case as to Mr. DeSantis, Mr. Jackson, and NYC Claims. On March 23, 2017, Judge Amon referred the motion for default judgment to me for a report and recommendation. Based on a review of all of the well-pleaded allegations and evidence presented in the SEC's filings, I respectfully recommend that the motion for default judgment be granted as to the liability of the Premier Links Defendants, and that the Court issue a permanent injunction against the Premier Links Defendants. However, I respectfully recommend that the motion for default judgment be denied at this time insofar as the SEC seeks an order of disgorgement against the Defaulting Defendants and a civil monetary penalty against the Premier Links Defendants.

## I. BACKGROUND[3]

The SEC is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Acts and the regulations that are promulgated pursuant to the Acts, 17 C.F.R. § 200.1 *et seq. See* Compl. ¶ 10. From at least December 2005 to

---

[3]  On a motion for default judgment, the Court "deems all the well-pleaded allegations in the pleadings to be admitted." *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 108 (2d Cir. 1997); *see also Bricklayers & Allied Craftworkers Local 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Constr., LLC*, 779 F.3d 182, 189 (2d Cir. 2015) (affirming liability of defaulting defendant based upon "the factual allegations in the complaint, combined with uncontroverted documentary evidence submitted by plaintiffs").

approximately August 2012 (the "Relevant Period"), Premier Links acted as an unregistered broker-dealer based in Staten Island, New York soliciting prospective clients to invest in unregistered securities of certain start-up companies that might conduct an initial public offering in the future. *Id.* ¶¶ 1, 2, 13. Mr. Malloy was president of Premier Links from at least August 2007 to the end of the Relevant Period, and personally served as a sales representative of Premier Links and solicited investments in unregistered securities on behalf of Premier Links during the Relevant Period. *Id.* ¶ 14. Similarly, Mr. Damon and Mr. Ruffin served as sales representatives of Premier Links and solicited investments in unregistered securities on behalf of Premier Links during the Relevant Period. *Id.* ¶¶ 15, 16. Neither Premier Links, nor Mr. Damon, nor Mr. Malloy, nor Mr. Ruffin ever registered with the SEC in any capacity. *Id.* ¶¶ 14-16, 72, 73.

Messrs. Damon, Malloy, and Ruffin engaged in aggressive marketing and sales efforts characterized by cold-calling prospective investors to pitch these speculative investments. *Id.* ¶ 26; *see also id.* ¶¶ 48-69 (describing experiences of five specific investors). Premier Links sold unregistered securities of at least four companies during the Relevant Period: Axiologix Education Corporation ("Axiologix"), Axiologix Holdings, Inc. ("Axiologix Holdings"), Digital Processing Solutions ("Digital"), and Edumedia Software Solutions Corp. ("Edumedia" and, together with Axiologix, Axiologix Holdings, and Digital, the "Issuers"); two of the Issuers' securities were never publicly traded. *Id.* ¶ 26. To induce investments, prospective investors were often mailed or otherwise provided with a cover letter from Mr. Malloy in his role as president of Premier Links and a stock purchase agreement (which they may have signed), providing, *inter alia*, "I understand that Premier Links, Inc. will arrange to have the company transfer agent effect the issuance of the shares from Premier Links, Inc. and the shares certificate representing this purchase will be sent to me at the address below." *Id.* ¶¶ 46, 80. Despite the stock purchase

agreement's express representation regarding the transfer of shares to investors, Premier Links frequently did not actually effect an issuance of shares or a transfer of the share certificates. *Id.* ¶¶ 46, 70, 71. Individuals who invested with Premier Links transferred money to Premier Links via check and wire transfer. *Id.* ¶¶ 50, 56, 59, 68.

The Premier Links Defendants sold approximately $9.3 million of stock during the Relevant Period and diverted more than 90% of the proceeds through, *inter alia*, conversions to cash or transfers by check to individual defendants or entities allegedly controlled by defendants in this case. *Id.* ¶¶ 38-43. The primary Premier Links bank account has received approximately $8.8 million in investor funds since December 2005; Mr. Bloome, Mr. Malloy, and Mr. Spinelli had signing authority for this account. *Id.* ¶ 39. In addition to being returned to investors, investor funds from the primary bank account were, for example: (i) transferred in cash or checks written to cash; (ii) transferred by check; (iii) spent on goods and services, including personal goods and services such as airline tickets, retail shopping, rent payments, and Walt Disney World reservations and tickets; and (iv) transferred to the companies whose stock was sold by Premier Links. *Id.* ¶¶ 40, 43. Approximately $937,750 of investor funds were transferred from the primary Premier Links bank account to a corporate account associated with D Biggest Corp., a corporate entity controlled by Mr. Malloy. *Id.* ¶ 43. Investor funds from this account were, for example, (i) converted to cash; (ii) spent on personal expenses; and (iii) transferred by check. *Id.*

A secondary Premier Links bank account received approximately $518,186 in investor funds from May 2007 through March 2012; Mr. Spinelli had sole signing authority over this account, but Ms. Rava also exercised control over the account. *Id.* ¶ 41. Investor funds from this bank account were, for example: (i) converted to cash; (ii) spent on personal goods and services,

such as retail shopping, rent payments, car payments, and at restaurants; and (iii) transferred by check. *Id.* ¶ 42.

Both the Premier Links Defendants and the Relief Defendants received misappropriated funds. *See generally* Dkt. No. 66 (Declaration of Joe A. Arroyo) ("Arroyo Decl." or the "Arroyo Declaration"). Among the Defaulting Relief Defendants: Mr. Anderson received at least $74,000 (Compl. ¶ 23); Mr. Bloome received at least $500,000 (*id.* ¶ 18); Mr. Byrne received at least $57,025, and Quatro (a corporation he allegedly controlled) received approximately $497,850, while Jo May Linens, an entity allegedly "affiliated" with Mr. Byrne, received $418,200 (*id.* ¶¶ 19, 25); Ms. Rava—who served as Premier Links' receptionist, among other responsibilities— received at least $25,000, in addition to her apparent control over the secondary Premier Links account (*id.* ¶ 21); and Mr. Spinelli—who served as president of Premier Links from at least December 2005 to September 2007—received at least $458,560, signed for over $250,000 in cash withdrawals and checks made payable to cash, and was the sole authorized signer on the secondary Premier Links account, which received over $500,000 in investor funds (*id.* ¶ 20).[4]

## II.   DISCUSSION

### A.   Liability

The Federal Rules of Civil Procedure prescribe a two-step process for a plaintiff to obtain a default judgment. First, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Second, after a default

---

[4]   The Complaint also alleges that Mr. DeSantis, Mr. Jackson, and NYC Claims received misappropriated investor funds. *Id.* ¶¶ 17, 22, 24. But these defendants have appeared and denied the allegations, so they are not deemed admitted at this stage. *See* Dkt. No. 14 (DeSantis Answer), ¶ 17; Dkt. No. 6 (Jackson Answer), at 2; Dkt. No. 27 (NYC Claims Answer), ¶ 24.

has been entered against the defendant, and the defendant fails to appear to move or set aside the default under Rule 55(c), the court may, on a plaintiff's motion, enter a default judgment. Fed. R. Civ. P. 55(b)(2).

Once a defendant is found to be in default, he is deemed to have admitted all of the well-pleaded allegations in the complaint pertaining to liability. *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). However, a court retains the discretion to determine whether a final default judgment is appropriate. *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993); *see also Taylor v. 312 Grand St. LLC*, 2016 WL 1122027, at *3 (E.D.N.Y. Mar. 22, 2016) ("[J]ust because a party is in default, the plaintiff is not entitled to a default judgment as a matter of right.") (internal quotation marks and citations omitted). In light of the Second Circuit's "oft-stated preference for resolving disputes on the merits," default judgments are "generally disfavored." *Enron*, 10 F.3d at 95-96.

Thus, despite a defendant's default, the plaintiff bears the burden of demonstrating that the unchallenged allegations and all reasonable inferences drawn from the evidence provided establish the defendant's liability on each asserted cause of action. *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011); *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981). "In other words, 'after default . . . it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law.'" *A. & R. Lobosco, Inc. v. Superior Trading, Inc.*, 2016 WL 5723982, at *2 (E.D.N.Y. Sept. 14, 2016) (citation omitted), *adopted by*, 2016 WL 5719720 (E.D.N.Y. Oct. 3, 2016). In this case, the SEC has established the liability of the Premier Links Defendants.

1.      Sale of Unregistered Securities

First, the SEC claims that the Premier Links Defendants sold unregistered securities in violation of Section 5 of the Securities Act, 15 U.S.C. § 77e. To establish a violation of that section, the SEC must prove that: (i) defendants sold or offered to sell securities; (ii) there was no registration statement in effect as to the securities; and (iii) there was a use of interstate transportation, interstate communication, or the mails in connection with the sale or offer to sell. *SEC v. Carrillo Huettel LLP*, 2017 WL 213067, at *3 (S.D.N.Y. Jan. 17, 2017) (citing *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 361 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2d Cir. 1998)), *adopted in relevant part by*, 2017 WL 1162199 (S.D.N.Y. Mar. 28, 2017). A defendant who has engaged in acts that were "necessary to" or a "substantial factor in the sales transaction" may be held liable under Section 5; in other words, if "but for the defendant's participation, the sale transaction would not have taken place," then the defendant is liable. *Carrillo Huettel*, 2017 WL 213067, at *3 (internal quotation marks and citations omitted).[5]

For the purposes of this motion, the SEC has established that the Premier Links Defendants are liable for a violation of Section 5 of the Securities Act. First, the Premier Links Defendants were "substantial factors" in the offering and sales of securities of the Issuers; each of Messrs. Damon, Malloy, and Ruffin was a sales representative authorized to speak on behalf of Premier Links (Compl. ¶¶ 14-16), Mr. Malloy was the president of Premier Links during much of the Relevant Period (*id.* ¶ 14), and each of Messrs. Damon, Malloy, and Ruffin was

---

[5]      There is an exemption from liability under Section 5 for "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1). But the burden of establishing the application of that exemption rests with the party seeking the exemption. *Carrillo Huettel*, 2017 WL 213067, at *3 n.7 (citing *SEC v. Guild Films Co.*, 279, F.2d 485, 489 (2d Cir. 1960)). Through their failure to respond or to appear, the Premier Links Defendants have failed to satisfy their burden of establishing that the exemption applies.

intimately involved in the offering and sales of the Issuers' securities to investors. Compl. ¶¶ 30, 32, 35, 37, 48-50, 52-56, 58-60, 62-63, 65-68. Next, the Edumedia, Axiologix Holdings, and Digital securities were unregistered, and the Axiologix shares were not sold in compliance with a relevant registration statement. *Id.* ¶¶ 28-30, 32, 34, 35, 37, 77-79. Finally, the Premier Links Defendants utilized interstate telecommunications, wire transfers, and the mails in connection with their offers and sales. *Id.* ¶¶ 48, 52, 54, 58, 59, 62, 65, 80. Accordingly, I conclude that the Premier Links Defendants violated Section 5 of the Securities Act. *See SEC v. Bass*, 2011 WL 4344001, at *2 (N.D.N.Y. Sept. 14, 2011) (finding liability under Section 5 of the Securities Act based on similar allegations at default judgment stage).

### 2.   Violations of Antifraud Provisions of the Acts

The SEC has also claimed that the Premier Links Defendants violated the antifraud provisions of the Acts. Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5, promulgated pursuant to the Exchange Act, prohibit fraud and deception in the sale of securities through means of interstate commerce or mail. *See* 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. In particular, to successfully establish a violation of Section 10(b) and Rule 10b-5, the SEC must sufficiently allege that each defendant "'(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities.'" *SEC v. Baldassare*, 2014 WL 2465622, at *4 (E.D.N.Y. Apr. 15, 2014) (quoting *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)), *adopted by*, 2014 WL 2465622, at *1 (E.D.N.Y. May 29, 2014). "'Essentially the same elements are required under Section 17(a)[ of the Securities Act] in connection with the offer or sale of a security, though no showing of scienter is required for the SEC to obtain an injunction[.]'" *Carrillo Huettel*, 2017 WL 213067,

at *3 (quoting *Monarch Funding*, 192 F.3d at 308). Each of the required elements is satisfied here.

First, the SEC has established that the Premier Links Defendants made material misrepresentations or omissions. "The fraud must concern a material fact, meaning that there must be a 'substantial likelihood that disclosure of the omitted fact would have been viewed by [a] reasonable investor as having significantly altered the "total mix" of information made available.'" *Bass*, 2011 WL 4344001, at *2 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). Here, the SEC has sufficiently alleged that the Premier Links Defendants induced investors to purchase the Issuers' securities on the basis of material misrepresentations and omissions. The Complaint alleges that the Premier Links Defendants: (i) falsely told prospective investors that the Issuers would be conducting an initial public offering and that the share price would increase (*see* Compl. ¶¶ 30, 32, 35, 49, 53, 62, 66); (ii) sent stock purchase agreements and account statements to investors that falsely indicated that the securities were or would be held by the investors but failed to send stock certificates or other documentation of investments because no purchases were actually made (*see id.* ¶¶ 46, 54, 60, 70, 71); and (iii) neglected to inform prospective investors that money earmarked for investments would be misappropriated (*see id.* ¶¶ 38-43, 45, 47, 49, 51, 53, 55, 57, 58, 60-64, 66, 67, 69). Messrs. Damon, Malloy, and Ruffin made these misrepresentations or omissions on behalf of Premier Links. *See* Compl. ¶¶ 13-16; *id.* ¶¶ 49, 58, 62, 63 (Damon); *id.* ¶¶ 49, 60, 66 (Malloy); *id.* ¶¶ 53-55, 58, 66, 67 (Ruffin).

Such misrepresentations and omissions would certainly be material to a reasonable investor. *See, e.g.*, *SEC v. Research Automation Corp.*, 585 F.2d 31, 35-36 (2d Cir. 1978) ("What reasonable investor would not wish to know that the money raised by stock sales would . . . be diverted to [the defendant company's] officers? It is beyond cavil that [defendants'] misleading

statements and omissions concerned facts that were material as a matter of law."); *SEC v. Constantin*, 939 F. Supp. 2d 288, 306-07 (S.D.N.Y. 2013) (finding "no doubt" that "patently misleading conduct," including diverting invested funds for personal and business expenses and providing investors with misleading documents to cover up a fraudulent scheme, was material); *Bass*, 2011 WL 4344001, at *3 ("These false statements regarding the use of invested funds are clearly material, and would have been substantially likely to have been perceived as important by a reasonable investor.") (citation omitted); *SEC v. Gallard*, 1997 WL 767570, at *3 (S.D.N.Y. Dec. 10, 1997) ("[T]here is no question a reasonable investor would consider important the fact that the 'security' at issue did not exist . . . and that the money paid for those securities would be misappropriated.") (citation omitted).

Second, the SEC has established that the Premier Links Defendants acted with scienter. For claims brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5, scienter requires an "'intent to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).[6] Scienter can be proven through "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citation omitted). A corporate defendant's scienter is proven when "an agent of the corporation committed a culpable act with the requisite scienter, and . . . the act (and accompanying mental state) are attributable to the corporation." *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) (citations omitted).

---

[6]   As stated above, scienter is not required for fraud claims brought pursuant to Section 17(a) of the Securities Act, so for such claims, "[a] showing of negligence is sufficient." *SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014).

Taking the allegations in the Complaint as true, Mr. Damon, Mr. Malloy, and Mr. Ruffin made a multitude of false statements and omissions to investors that each of them must have known to be false. *See* Compl. ¶¶ 48-50, 58, 62, 63, 72, 74 (Damon); *id.* ¶¶ 48-50, 60, 65, 66, 72, 74 (Malloy); *id.* ¶¶ 52-55, 58, 65-67, 72, 74 (Ruffin); *see also Bass*, 2011 WL 4344001, at *3. Each of them was a sales representative authorized to speak on behalf of Premier Links (Compl. ¶¶ 14-16), and Mr. Malloy was the president of Premier Links during much of the Relevant Period (*id.* ¶ 14), so their conduct and state of mind may be imputed to Premier Links. *See SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972) (finding that an individual's "awareness of the securities laws violations are imputed" to corporate entities where the individual "exercised blanket authority in the matter of securities transactions" for entities); *see also Bass*, 2011 WL 4344001, at *3. Accordingly, the Premier Links Defendants each possessed the requisite state of mind.

Third, the Premier Links Defendants' material misstatements and omissions were made in connection with the sale of securities. The "in connection with" requirement is construed "broadly so as to encompass fraud in any part of the selling process." *Constantin*, 939 F. Supp. 2d at 303 (internal quotations marks and citations omitted). "[I]t is enough that the fraud alleged 'coincide' with a securities transaction." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (citation omitted). Here, the Premier Links Defendants solicited and encouraged prospective investors to invest through Premier Links in the purchase of securities from the Issuers. *See* Compl. ¶¶ 48-50, 58, 62, 63, 72, 74 (Damon); *id.* ¶¶ 48-50, 60, 65, 66, 72, 74 (Malloy); *id.* ¶¶ 52-55, 58, 65-67, 72, 74 (Ruffin). "This conduct alone is sufficient to constitute conduct 'in connection with' the purchase of securities." *Constantin*, 939 F. Supp. 2d at 303; *accord SEC v. Shehyn*, 2010 WL 3290977, at *5 (S.D.N.Y. Aug. 9, 2010).

In addition, the jurisdictional component of the Acts requires that defendants use an "instrument" or "instrumentality" of interstate commerce. 15 U.S.C. § 77q; 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5. Here, the jurisdictional requirement is satisfied because the Premier Links Defendants used the mails, telecommunications, and wire transfers in connection with these sales of securities. Compl. ¶¶ 48, 52, 54, 58, 59, 62, 65, 80; *see Baldassare*, 2014 WL 2465622, at *6; *Constantin*, 939 F. Supp. 2d at 305.

Accordingly, I respectfully recommend that each of the Premier Links Defendants be held liable for violations of the antifraud provisions of the Acts and Rule 10b-5.

### 3.     Acting as an Unregistered Broker-Dealer

Finally, the SEC has claimed that the Premier Links Defendants violated Section 15(a) of the Exchange Act by acting as unregistered broker-dealers. 15 U.S.C. § 78o(a). Under that section, it is unlawful for (i) an unregistered (ii) broker or dealer (iii) to make use of the mails or any means or instrumentality of interstate commerce (iv) to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security. *SEC v. Gibraltar Glob. Sec., Inc.*, 2016 WL 153090, at *2 (S.D.N.Y. Jan. 12, 2016) (citing 15 U.S.C. § 78o(a)(1)). There is no scienter requirement. *SEC v. Aronson*, 2013 WL 4082900, at *7 (S.D.N.Y. Aug. 6, 2013).

Here, the SEC has sufficiently established that the Premier Links Defendants violated Section 15(a) of the Exchange Act. As of the time of the filing of the Complaint, no Premier Links Defendant had registered with the SEC in any capacity, satisfying the first element. Compl. ¶¶ 13-16, 73. Yet during the Relevant Period, the Premier Links Defendants sold or attempted to sell securities of at least four companies (the Issuers) to investors, satisfying the fourth element. Compl. ¶¶ 26, 30, 32, 35, 37, 44-69.

As to the second element, a broker is defined under the Exchange Act as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A). A person who solicits investors to purchase securities and who takes client funds is acting as a broker. *Gibraltar Glob. Sec.*, 2016 WL 153090, at *2 n.1 ("[E]vidence of brokerage activity may include . . . possessing client funds and securities.") (internal quotation marks and citation omitted); *SEC v. StratoComm Corp.*, 2 F. Supp. 3d 240, 262 (N.D.N.Y. 2014). Here, the Premier Links Defendants sold securities to investors and Premier Links took hold of client funds. *See* Compl. ¶¶ 26, 30, 32, 35, 37-69. Thus, the Premier Links Defendants were acting as brokers under the Exchange Act.[7]

Finally, the third element is also satisfied. The Premier Links Defendants utilized wire transfers, the mails, and telephone calls to effect purchases and sales of securities. Compl. ¶¶ 26, 48, 52, 54, 58, 59, 62, 65, 80. These actions, alone and in combination, suffice to establish the interstate commerce element of Section 15(a). *See Gibraltar Glob. Sec.*, 2016 WL 153090, at *2.

Accordingly, I respectfully recommend that the Premier Links Defendants be found liable for acting as unregistered broker-dealers in violation of Section 15(a) of the Exchange Act.

### B.    Relief

The SEC has requested the following relief: (i) against the Premier Links Defendants, a permanent injunction preventing future violations of securities laws; (ii) against the Premier Links Defendants, disgorgement of ill-gotten gains plus prejudgment interest; (iii) against the Defaulting Relief Defendants, disgorgement of ill-gotten gains plus prejudgment interest; and

---

[7]    The SEC does not address "control person" liability under the Exchange Act, 15 U.S.C. § 78t, so I do not address it here; the allegations in the Complaint suffice to establish that each of the Premier Links Defendants is individually liable: Premier Links offered and sold stock in unregistered transactions and Messrs. Damon, Malloy, and Ruffin were necessary participants in those offerings. *See StratoComm*, 2 F. Supp. 3d at 264.

(iv) against the Premier Links Defendants, a civil monetary penalty. *See* Compl., Prayer for Relief. I will address each of these in turn.

1.   <u>Permanent Injunction Against Premier Links Defendants</u>

In addition to monetary relief, a court may grant a permanent injunction on a motion for default judgment. *E.g.*, *Baldassare*, 2014 WL 2465622, at *7. The Acts each provide that "upon a proper showing a permanent or temporary injunction or restraining order shall be granted" (15 U.S.C. §§ 77t(b), 78u(d)(1)), and a court has broad authority to issue permanent injunctive relief when a defendant has violated securities laws and there is a reasonable likelihood that he will do so again. *Carrillo Huettel*, 2017 WL 213067, at *6; *accord Baldassare*, 2014 WL 2465622, at *7. In assessing the likelihood of future violations, a court may consider "the fact that [the] defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an 'isolated occurrence;' whether [the] defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated." *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 100 (2d Cir. 1978) (citation omitted).[8]

Here, many of these factors favor entry of a permanent injunction barring the Premier Links Defendants from violating federal securities laws. The Premier Links Defendants' non-participation limits the available evidence for the Court to evaluate, but the uncontroverted allegations and evidence that have been presented in this litigation demonstrate that the Premier Links Defendants' activities were part of a knowing and continuous course of conduct during the

---

[8]    For their part, the Federal Rules of Civil Procedure provide that "[e]very order granting an injunction" must state the reasons why it is being issued; state its terms specifically; and describe in reasonable detail, rather than by referring to the complaint or another document, the acts that are restrained or required. Fed. R. Civ. P. 65(d)(1).

Relevant Period. Each of the Premier Links Defendants has been found liable for violations of federal securities laws—including antifraud provisions—and scienter has been established. *See* Compl. ¶¶ 48-50, 58, 62, 63, 72, 74 (Damon); *id.* ¶¶ 48-50, 60, 65, 66, 72, 74 (Malloy); *id.* ¶¶ 52-55, 58, 65-67, 72, 74 (Ruffin). The Premier Links Defendants' "fraudulent past conduct gives rise to an inference of a reasonable likelihood of continued violations." *Baldassare*, 2014 WL 2465622, at *7. This is especially true considering that the Relevant Period during which the Premier Links Defendants allegedly engaged in such fraudulent activity lasted nearly seven years, suggesting that this activity was no isolated event. Compl. ¶ 1.

Accordingly, I respectfully recommend that Premier Links, and Messrs. Damon, Malloy, and Ruffin, and their agents, servants, employees, attorneys, and all persons in active concert or participation with them be enjoined from committing future violations of Sections 5(a), 5(c), and 17(a) of the Securities Act (15 U.S.C. §§ 77e(a), 77e(c), 77q(a)), Sections 10(b) and 15(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78o(a)), and Rule 10b-5 promulgated pursuant to the Exchange Act (17 C.F.R. § 240.10b-5), or, alternatively, from aiding and abetting such future violations.

### 2.   Disgorgement by Defaulting Defendants

The SEC also seeks disgorgement of ill-gotten gains by the Defaulting Defendants, plus prejudgment interest on those gains. As the Supreme Court has recently recounted, explicit congressional authority permits the SEC to seek injunctive relief and civil monetary penalties, but the SEC has pursued disgorgement as a remedy in enforcement proceedings since approximately 1970. *See Kokesh v. SEC*, -- U.S. --, 137 S.Ct. 1635, 1640 (2017). Disgorgement has long been viewed as an equitable remedy ordered "to 'deprive . . . defendants of their profits in order to remove any monetary reward for violating' securities laws and to 'protect the

investing public by providing an effective deterrent to future violations.'" *Id.* (quoting *SEC v. Texas Gulf Sulphur Co.*, 312 F. Supp. 77, 92 (S.D.N.Y. 1970), *aff'd in part, rev'd in part*, 446 F.2d 1301 (2d Cir. 1971)); *see SEC v. Contorinis*, 743 F.3d 296, 306 (2d Cir. 2014).

Courts have wide discretion to determine whether disgorgement is appropriate and the amount that should be disgorged; "in setting the disgorgement amount, a court must focus on the extent to which a defendant has profited from his [illegal conduct]." *Carrillo Huettel*, 2017 WL 213067, at *7 (internal quotation marks and citation omitted). "The amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation, [and] any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996) (internal quotation marks and citations omitted). Joint and several liability is permitted for disgorgement where two or more individuals or entities collaborate to violate federal securities laws. *SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 288 (2d Cir. 2013); *accord SEC v. Haligiannis*, 470 F. Supp. 2d 373, 385 (S.D.N.Y. 2007).

Here, the SEC seeks disgorgement jointly and severally among the Premier Links Defendants and individually as to each of the Defaulting Relief Defendants.[9] *See* Compl. ¶¶ 17-25, 38-43 (describing ill-gotten gains); Arroyo Decl. ¶¶ 7-15; Arroyo Decl., Exs. A & B (Premier Links Debits/Credits) & Ex. C (D Biggest Corp. Debits/Credits). While the SEC has seemingly provided sufficient allegations and evidence for the Court to find joint and several liability for disgorgement by the Premier Links Defendants, and individual liability for disgorgement by the Defaulting Relief Defendants, the Supreme Court opinion in *Kokesh* imposes a time bar on

---

[9]     The one exception to this is that the SEC requests that Mr. Byrne and Quatro jointly and severally be ordered to disgorge certain ill-gotten gains. *See* Dkt. No. 65 (Memorandum in Support), at 21 n.8. I will discuss this particular situation in more detail below.

disgorgement and the SEC has provided insufficient information to sustain the disgorgement amounts requested.

A five-year statute of limitations applies to any "action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise." 28 U.S.C. § 2462. Prior to *Kokesh*, there had been a Circuit split between courts finding that disgorgement was not covered by this statutory language and those that held that the limitations period applied to disgorgement in the securities enforcement context. *Compare SEC v. Graham*, 823 F.3d 1357, 1363 (11th Cir. 2016) ("[F]or the purposes of § 2462 forfeiture and disgorgement are effectively synonyms; § 2462's statute of limitations applies to disgorgement."), *with Riordan v. SEC*, 627 F.3d 1230, 1234 (D.C. Cir. 2010) ("[D]isgorgement orders are not penalties, at least so long as the disgorged amount is causally related to the wrongdoing.") (citations omitted), *and SEC v. Ahmed*, -- F. Supp. 3d --, 2016 WL 7197359, at *6-7 (D. Conn. Dec. 8, 2016) (declining to follow *Graham* and concluding that "there is substantial authority within the Second Circuit that Section 2462's statute of limitations does not apply to claims for disgorgement and none suggesting otherwise.") (citations omitted). But the *Kokesh* Court unequivocally concluded that disgorgement was a penalty for purposes of 28 U.S.C. § 2462, meaning that the five-year limitations period applies to any SEC enforcement action seeking disgorgement. *Kokesh*, -- U.S. --, 137 S.Ct. at 1644 ("SEC disgorgement thus bears all the hallmarks of a penalty: It is imposed as a consequence of violating a public law and it is intended to deter, not to compensate. The 5-year statute of limitations in § 2462 therefore applies when the SEC seeks disgorgement.").[10]

---

[10]     The Supreme Court indicated that it may be willing to revisit the viability of the disgorgement remedy, noting: "Nothing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings or on whether courts have properly applied disgorgement principles in this context[.] The sole question presented in this case is whether disgorgement, as applied in SEC enforcement actions, is subject

Cast in this harsh light, the SEC has not provided sufficient allegations and evidence to permit the Court to order disgorgement at this time. The Complaint in this action was filed on December 18, 2014, meaning that disgorgement is only permitted for assets unlawfully obtained on or after December 18, 2009. But the SEC's filings are presently incomplete: the Relevant Period during which the unlawful conduct was perpetrated and the unlawful gains were obtained ranged from December 2005 to August 2012, and the SEC's allegations and evidence do not delineate the timing of the various defendants' acquisitions of ill-gotten gains. *See, e.g.*, Compl. ¶¶ 1, 26, 38, 39; Arroyo Decl. ¶¶ 6, 7, 11; Arroyo Decl., Exs. A & B (Premier Links Credits/Debits).[11] As a result, ascertaining even a "reasonable approximation of profits causally connected to the violation" is impossible. *First Jersey Sec.*, 101 F.3d at 1475 (internal quotation marks and citation omitted). Accordingly, I respectfully recommend that the Court decline to order disgorgement at this time and that the Court direct the SEC to submit supplemental

---

to § 2462's limitations period." *Kokesh*, -- U.S. --, 137 S.Ct. at 1642 n.3; *see also* Tr. of Oral Argument at 31:16-21, *Kokesh v. SEC*, 137 S.Ct. 1635 (2017) (No. 16-529) (CHIEF JUSTICE ROBERTS: "One reason we have this problem is that the SEC devised this remedy or relied on this remedy without any support from Congress."); *id.* at 7:20-8:2 (JUSTICE KENNEDY: "Is it clear that the district court has statutory authority to do this? . . . Is—is there specific statutory authority that makes it clear that the district court can entertain this remedy?"). But at this juncture, case law does not support the conclusion that disgorgement is impermissible in SEC enforcement actions such as this one.

[11]     This conclusion follows equally as to the Defaulting Relief Defendants and the Premier Links Defendants: there is no indication in any of the SEC's filings as to when the Defaulting Relief Defendants received ill-gotten funds to which they did not have a "legitimate claim." *See Cavanagh*, 155 F.3d at 136 ("Federal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds."). The Complaint simply alleges that the Defaulting Relief Defendants were affiliated with Premier Links during the Relevant Period (which extends beyond the five-year limitations period) and that they received certain ill-gotten gains. *See* Compl. ¶¶ 18-23, 38-43; *see also* Arroyo Decl. ¶¶ 7-15. Based on the record before the Court, it is impossible to determine which alleged ill-gotten gains were obtained by the Defaulting Relief Defendants during the five-year limitations period and which gains fall outside of that period.

information supporting the disgorgement amounts requested.[12] *See SEC v. Durham*, 2017 WL 3581640, at *8 (S.D. Ind. Aug. 18, 2017) ("As a final matter, as the Commission concedes, the Commission's requested disgorgement amount is likely inconsistent with the statute of limitations for securities fraud disgorgement recently recognized by the Supreme Court in *Kokesh*[.]").

---

[12]     The SEC should also be ordered to further substantiate the disgorgement amount sought from Mr. Byrne jointly and severally with Quatro and from Mr. Byrne through Jo May Linens. As to Quatro, the SEC has offered only bare, conclusory allegations and evidence regarding Quatro's relationship to Mr. Byrne. *See* Compl. ¶ 19 (describing "cashiers' checks made out to Quatro Holdings, a New York corporation [Mr. Byrne] controlled"); *id.* ¶ 25 ("Quatro Holdings is an active New York corporation controlled by Byrne with no known substantive business operations."); Arroyo Decl. ¶ 5 (identifying Mr. Byrne as having sole signing authority for Quatro); *id.* ¶ 10(e) (noting that cashiers' checks were "presumably" cashed by Mr. Byrne). The SEC's allegations and the evidence presented to the Court are not sufficient to establish that Quatro is an "alter ego" of Mr. Byrne. For one thing, the SEC seems to acknowledge Mr. Byrne's limited authority over Quatro; he is identified as the entity's corporate secretary only. Arroyo Decl. ¶ 5. Furthermore, the conclusory language and assumptions proffered do not sufficiently establish Mr. Byrne's control. *Cf. SEC v. Aimsi Techs., Inc.*, 650 F. Supp. 2d 296, 301-02, 304-06 (S.D.N.Y. 2009) (holding that entities were alter egos of fugitive defendant and could be held jointly and severally liable for disgorgement purposes based on lengthy allegations regarding fugitive's ownership, control, and misuse of the entities). Accordingly, the SEC must provide additional evidence to support the imposition of joint and several liability as to Mr. Byrne and Quatro.

       Moreover, the allegations concerning assets allegedly received by Mr. Byrne through Jo May Linens are even barer than those explaining Mr. Byrne's relationship with Quatro. Ultimately, the SEC has not established that Mr. Byrne exercised sufficient control over Jo May Linens—a nonparty—to conclude that any ill-gotten assets provided to Jo May Linens were effectively being provided to Mr. Byrne. Most significantly, the only allegations in the Complaint and statements in the Arroyo Declaration regarding Jo May Linens describe the entity as being an "affiliate" of Mr. Byrne. Arroyo Decl. ¶ 10(f) ("$418,200 primarily in the form of cashiers' checks to Jo May Linens, an affiliate of Relief Defendant Byrne"); Compl. ¶ 19 (alleging that Mr. Byrne "controlled" Quatro, but merely endorsed checks made out to Jo May Linens). The SEC does not even allege that Mr. Byrne endorsed *all* checks made out to Jo May Linens, but only "most" of them. Compl. ¶ 40(h). Accordingly, I respectfully recommend that the SEC be directed to make a further showing that such disgorgement is appropriate here.

3.      Civil Monetary Penalty Against Premier Links Defendants

The federal securities laws permit courts to impose civil penalties for securities violations based on a three-tiered system. *See* 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B). A first-tier penalty is appropriate for any violation, a second-tier penalty is appropriate for a violation that involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and a third-tier penalty may be imposed if, in addition to the requirements for a second-tier penalty, the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B). For violations occurring between March 4, 2009 and March 5, 2013, the maximum statutory penalty for a first-tier violation is $7,500 for natural persons and $75,000 for entities, for a second-tier violation is $75,000 for natural persons and $375,000 for entities, and for a third-tier violation is $150,000 for natural persons and $725,000 for entities. *See* 17 C.F.R. § 201.1001, Table 1; *accord Carrillo Huettel*, 2017 WL 213067, at *9. Regardless of the appropriate tier, a court has the authority to impose a civil monetary penalty equal to the amount of "pecuniary gain" received by a defendant as a result of the violation, if that amount is greater than the listed statutory maximum. 15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i).

Beyond setting maximum penalties, the Acts leave the actual amount of the penalty to the discretion of the district court. *SEC v. Razmilovic*, 738 F.3d 14, 38 (2d Cir. 2013) (citation omitted); *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005) ("The tier determines the maximum penalty, with the actual amount of the penalty left up to the discretion of the district court."). In exercising this discretion, a court may consider a number of factors in setting the size of a civil monetary penalty, including:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit their

21

wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

*Carrillo Huettel*, 2017 WL 213067, at *9 (internal quotation marks and citation omitted).

As an initial matter, the Premier Links Defendants' conduct appears to warrant the imposition of significant civil monetary penalties. As discussed above, there is no dispute that each of the Premier Links Defendants directly and intentionally participated in a fraudulent scheme that lasted beyond the five-year limitations period and that involved fraud and deliberate (or at least reckless) disregard of regulatory requirements, which either resulted in substantial losses to Premier Links' investors or created a risk of substantial losses to Premier Links' investors. Though the specter of criminal prosecution at least partly explains their non-appearances in this case, when they were confronted with their wrongdoing in this enforcement action, the Premier Links Defendants chose to offer no defense. There is no evidence that the Premier Links Defendants have attempted to remedy their wrongdoing or to return the vast majority of any misappropriated assets to Premier Links' investors, nor is there evidence of any mitigating factor.

However, two wrinkles preclude such an imposition. First, a civil monetary penalty may not be imposed jointly and severally. *Pentagon Capital Mgmt.*, 725 F.3d at 288 (noting that statutory language requires awards based on the "'gross amount of pecuniary gain *to such defendant*'") (quoting 15 U.S.C. § 77t(d)(2)) (emphasis in opinion); *accord* 15 U.S.C. § 78u(3)(B) (specifying amount of penalty as "the gross amount of pecuniary gain *to such defendant*") (emphasis added). Second, like with disgorgement, 28 U.S.C. § 2462 applies a five-year statute of limitations to civil monetary penalties in SEC enforcement actions, so any of the Premier Links Defendants' gains from more than five years before the SEC instituted this lawsuit

may not be included in the penalty imposed. *Pentagon Capital Mgmt.*, 725 F.3d at 287 (citing *Gabelli v. SEC*, 568 U.S. 442, 448-54 (2013)). Accordingly, issues similar to those regarding disgorgement mar the SEC's request for a civil monetary penalty here.

The SEC proposes four methods of calculating a civil monetary penalty: (i) multiplying the statutory penalty by the number of victims (*e.g.*, *SEC v. Glantz*, 2009 WL 3335340, at *6 (S.D.N.Y. Oct. 13, 2009)); (ii) multiplying the statutory penalty by the number of unlawful acts (*e.g.*, *Pentagon Capital Mgmt.*, 725 F.3d at 288 n.7); (iii) multiplying the statutory penalty by the number of securities laws violated (*e.g.*, *Shehyn*, 2010 WL 3290977, at *8); and (iv) awarding a penalty in the amount of the alleged unlawful gain (*see* 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)).The SEC does not request that the Court use any particular methodology for calculating the civil monetary penalty, but proposes that the Court impose "maximum" penalties. *See* Dkt. No. 65 (Memorandum in Support), at 22-25. I conclude that none of these methodologies would be workable because of the issues mentioned above concerning joint and several liability and the statute of limitations.

In addition, there are specific problems with three of the proposed methods based on the current record, such as the fact that there are apparently hundreds of victims (for the first method), the fact that the number of unlawful acts will be near-impossible to ascertain (for the second method), and the lack of rationale for apportioning the amount of the alleged unlawful gain between defendants who are not jointly and severally liable (for the first and fourth methods). The only potentially workable method of calculating the civil monetary penalty based on the current record would be the third method: multiplying the statutory penalty by the number of securities laws violated. But this method would yield a monetary penalty that is considerably

less than the other proposed methods and is therefore inconsistent with the SEC's request for "maximum" penalties.

At bottom, the fundamental issue is that the Court cannot be certain of which actions took place within the five-year limitations period (*i.e.*, between December 9, 2009 and the end of the Relevant Period) and which took place before it. Based on the record presently before the Court, I cannot easily ascertain the "repeated nature of the violations" or the extent to which the Premier Links Defendants' "conduct created substantial losses or the risk of substantial losses to other persons" during the limitations period. *See Carrillo Huettel*, 2017 WL 213067, at *9 (internal quotation marks and citation omitted). In light of the Court's broad discretion to determine a reasonable civil monetary penalty, I respectfully recommend that the Court decline to impose a civil monetary penalty upon any of the Premier Links Defendants at this time and that the Court direct the SEC to provide additional information in support of this request.

## III.   CONCLUSION

For the foregoing reasons, the Court respectfully recommends that the SEC's motion for default judgment be granted in part and denied in part. In particular, I respectfully recommend that (i) Premier Links, Inc.; (ii) Chris Damon; (iii) Dwayne Malloy; and (iv) Thierry Ruffin a/k/a Thierry Regan (a) be found liable for violating Section 5 of the Securities Act, 15 U.S.C. § 77e; Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); Rule 10b-5, 17 C.F.R. § 240.10b-5; and Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a); and (b) be permanently enjoined from committing or aiding and abetting future violations of the securities laws and rules they were alleged to have violated. I also respectfully recommend that the Court decline to order disgorgement or to impose a civil monetary penalty at

this time, and that the Court direct the SEC to provide supplemental information regarding its requests for disgorgement and a civil monetary penalty.

Plaintiff's counsel is directed to serve a copy of this Report and Recommendation upon all non-appearing defendants at their respective last known address and to file proof of service with the Court within seven (7) days of the date of filing of this Report and Recommendation.

## IV.  OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Marcella v. Capital Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42, 46 (2d Cir. 2002); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

**SO ORDERED.**

_____/s/_____
Steven L. Tiscione
United States Magistrate Judge
Eastern District of New York

Dated: Brooklyn, New York
September 14, 2017